IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

DEMETRIO MCCULLOUGH,

*Defendant*.

Criminal Action No. ELH-19-0286

**MEMORANDUM OPINION**

Defendant Demetrio McCullough is serving a period of incarceration of 84 months for the offenses of conspiracy to distribute and possess with intent to distribute controlled substances, and possession with intent to distribute controlled substances. That sentence was imposed on October 1, 2020, with credit from September 2019. On or about January 7, 2021, McCullough filed a pro se motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF 914 (the "Motion").[1] In other words, the Motion was filed approximately four months after sentence was imposed.

The government opposes the Motion (ECF 1290) and has submitted several exhibits, including almost 150 pages of defendant's medical records. ECF 1290-3. The defendant has not replied, and the time to do so has expired.

The defendant has exhausted his administrative remedies. No hearing is necessary to resolve this matter. For the reasons that follow, I shall deny the Motion, without prejudice.

---

[1] The Federal Public Defender's Office has declined to represent Mr. McCullough in this matter. ECF 1000.

# I.      Factual Background

On June 11, 2019, the defendant and 19 codefendants were charged in an Indictment that contained 17 counts.  Of relevance here, defendant was charged with Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846 (Count One); Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (Count Eleven); and Possession with intent to Distribute Cocaine and Heroin (Count Twelve).  *See* ECF 23.

A Superseding Indictment was filed on June 25, 2019.  ECF 96.  It added six defendants and included 30 counts.  *Id.*  Specifically, the defendant was charged in Count One with Conspiracy to Distribute more than one kilogram of heroin, more than five kilograms of cocaine, more than 280 grams of cocaine base ("crack"), and a detectable amount of fentanyl, in violation of 21 U.S.C. § 846.  That offense exposed the defendant to a mandatory minimum sentence of 10 years' imprisonment, with a maximum of life imprisonment.  Defendant was also charged in Count Thirteen with Possession with intent to Distribute Cocaine and Heroin, in violation of 21 U.S.C. § 841.

On August 18, 2020, the defendant entered a plea of guilty (ECF 655) to two counts of a Superseding Information.  ECF 626.  Count One of the Superseding Information charged conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and Count Two charged possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841.

The plea was tendered pursuant to a Plea Agreement.  ECF 656.  In the Plea Agreement, the parties agreed that the defendant qualified as a Career Offender under § 4B1.1(b) of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), and therefore he had a Criminal

History Category of VI. *See* ECF 656, ¶ 7. Moreover, pursuant to Fed. Rule of Crim. P. 11 (c)(1)(C), the parties agreed to a sentence ranging from 72 to 96 months of imprisonment as the appropriate disposition. *Id.* ¶ 9.

The Amended Presentence Report (ECF 759, "PSR") indicated that defendant was 42 years of age at sentencing. *Id.* at 3. He lacked a high school diploma or a GED. *Id.* His base offense level was 24 (*id.* ¶ 21), but that offense level was increased to 32 based on the defendant's status as a Career Offender. *Id.* ¶ 22; *see* U.S.S.G. § 4B1.1. After three deductions for acceptance of responsibility (*id.* ¶¶ 23, 24), the defendant had a final offense level of 29. *Id.* ¶ 24.

The qualifying Career Offender predicates are found in ECF 759, ¶¶ 28, 33, and 37. Because the defendant qualified as a Career Offender, he had a Criminal History Category of VI. *Id.* ¶ 37. If defendant were not a Career Offender, however, he would have had a Criminal History Category of IV. *Id.* ¶ 36.

Based on an offense level of 29 and a Criminal History Category of VI, the Guidelines called for a period of incarceration ranging from 151 months to 188 months. *Id.* ¶ 79. On October 1, 2020, pursuant to the C plea, the Court sentenced defendant to 84 months of imprisonment, with credit for time served since September 18, 2019. ECF 760 (Judgment).

On January 7, 2021, defendant filed a motion for compassionate release in light of the COVID-19 pandemic. ECF 914. He claims a "Debilitated Medical Condition." ECF 914-2 at 3. In particular, defendant referenced his asthma, obesity, and "Bronchospasm," as well as depression. ECF 914-1 at 1. The defendant has also provided a "proposed release plan." ECF 914-3.

At the time of filing the Motion, McCullough was serving his sentence at FCI Fort Dix. *See* ECF 914 at 6. However, it appears that he has since been transferred to USP Lewisburg. *See*

*Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Apr. 5, 2022); *see also* ECF 1290-3 at 97, 98.  He has a projected release date of June 30, 2025.  ECF 914 at 2.

## II.      Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, ___ F.4th ___, 2022 WL 905436, at *3 (4th Cir. Mar. 29, 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."   18   U.S.C.   § 3582(c)(1)(B);   *see   Jackson*,   952   F.3d   at   495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 2022 WL 905436, at *3.  This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the

5

safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 2022 WL 905436, at *3; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)). In § 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G."), titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy*, 981 F.3d at 276-77.[2]

---

[2] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy*, 981 F.3d at 276.

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 2022 WL 905436, at *3-4. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 2022 WL 905436, at *6. But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, ___ F. App'x ___, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t). However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

As noted, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 2022 WL 905436, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 2022 WL 905436, at *4; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169.  Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94;

*United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III. COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[3]  Defendant filed his motion for compassionate release in January 2021.  ECF 914 at 6.  At the time, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v.*

---

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

*Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of April 5, 2022, COVID-19 has infected more than 80.2 million Americans and caused approximately 982,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Apr. 5, 2022).

In the Fall of 2021, the country enjoyed a reduction in COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months"). Indeed, the Delta variant was thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");   *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

Then, the Omicron variant emerged, both around the world and in the United States, which sparked further cause for concern. It, too, is highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Recently, however, the number of COVID-19 cases has declined considerably. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. The country has generally returned to some normalcy.

Nevertheless, the coronavirus remains of concern.  And, of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL &

PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*.

However, the Fourth Circuit has cautioned that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive."  *Hargrove*, 2022 WL 905436, at *4.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category."  *Id.* at *5.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

14

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954

F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[4]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney

---

[4] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  Significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[5]  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 66% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 72% of people from ages 18 to 64, and 89% of

---

[5] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Apr. 5, 2022).

Moreover, approximately 98.1 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Mar. 31, 2022).   And, federal regulators have recently approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 5, 2022, the BOP had 135,398 federal inmates and approximately 36,000 staff.  And, by that date,

the BOP had administered 309,488 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 5, 2022).

As of April 5, 2022, the BOP reported that 88 federal inmates, out of a total population of 135,587, and 137 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19. Moreover, 53,412 inmates and 12,538 staff have recovered from the virus. And, 292 inmates and seven staff members have died from the virus. The BOP has completed 128,802 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP Lewisburg, where the defendant is imprisoned, the BOP reported that as of April 5, 2022, out of a total of 1,034 inmates, one inmate and zero staff members have tested positive, one inmate has died of COVID-19, and 353 inmates and 171 staff have recovered at the facility. In addition, 292 staff members and 1,087 inmates at the USP Lewisburg complex have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/lew/ (last visited Apr. 5, 2022).

### IV.    Discussion

The Motion indicates that, in light of the COVID-19 pandemic, McCullough's numerous medical conditions present an extraordinary and compelling circumstance that warrants his release from prison. ECF 914-2 at 3. In addition, he advises the Court that he plans to live with his girlfriend upon his release from prison. *Id.* And, defendant states that he will enjoy the support of his grandmother, Mable McCullough, following his release. ECF 914-3 at 5.

The government opposes the Motion on the ground that McCullough's medical conditions no longer amount to an extraordinary and compelling reason for his release because McCullough has been fully vaccinated against COVID-19. ECF 1290 at 22. In any event, the government

argues that the Motion should be denied because the sentencing factors outlined in 18 U.S.C. § 3553(a) weigh against defendant's release.  *Id.* at 30-32.

## A.

As mentioned, McCullough maintains that the Court should grant the Motion because his underlying health conditions render him particularly vulnerable to COVID-19 and thus create an extraordinary and compelling reason for his release.  ECF 914-2 at 3.  In particular, McCullough notes that he suffers from a number of conditions, including asthma, obesity, and depression.  *Id.*[6] Moreover, medical records submitted with the Opposition corroborate defendant's assertions concerning his asthma and depression.  *See*, *e.g.*, ECF 1290-3 at 33, 35, 68.  In addition, the medical records reveal that McCullough's BMI has fluctuated between 31.2 and 32.2 throughout his term of imprisonment. *See id.* at 2, 6, 79.  And, according to the CDC, defendant's BMI renders him obese.  *See Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcul ator.html (last accessed Apr. 5, 2022).  As the government points out (ECF 1290 at 28-29), the medical records also reveal that defendant has a history of smoking.  ECF 1290-3 at 58.

As discussed above, obesity, asthma, depression, and a history of smoking are among the conditions that, according to the CDC,  "can make you more likely to get very sick from COVID-19."  *See Certain Medical Conditions, supra*.  In addition, the CDC cautions that "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in an

---

[6] Defendant also claims to suffer from bronchospasm.  ECF 914-2 at 3.  The parties' submissions do not elaborate on the nature of this condition.  But, "bronchospasm" appears to refer to "temporary narrowing of the bronchi (airways into the lungs) caused by contraction of the muscles in the lung walls, by inflammation of the lung lining, or by a combination of both," and is a "chief characteristic of asthma and bronchitis."  *Bronchospasm*,  HEALTHCENTRAL, https://www.healthcentral.com/condition/bronchospasm (last accessed Apr. 6, 2022).

individual." *Id.* Nonetheless, the government argues that defendant's medical conditions no longer present an extraordinary and compelling reason for his release because he has been fully vaccinated against COVID-19.  ECF 1290 at 22; *see* ECF 1290-3 at 71.

To be sure, the COVID-19 vaccines effectively reduce the health risks posed by the coronavirus.  But, the fact that McCullough has received two doses of a COVID-19 vaccine "does not negate that his underlying health conditions make him eligible for compassionate release." *Spriggs*, 2021 WL 1856667, at *3; *see United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues.").

Moreover, as discussed above, the trajectory of the COVID-19 pandemic has proven less than predictable.  The Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CNTRS. FOR DISEASE CONTROL, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Apr. 6, 2022).  To that end, the CDC issued recommendations "encouraging everyone 16 and older to receive a booster shot" of an authorized COVID-19 vaccine. *See CDC Expands COVID-19 Booster Recommendations to 16- and 17-year-olds*, CNTRS. FOR DISEASE CONTROL, Dec. 9, 2021, https://www.cdc.gov/media/releases/2021/s1208-16-17-booster.html (last accessed Apr. 6, 2022).  Notably, the parties have not indicated whether McCullough has received a booster shot.

And, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding his vaccination status. *See, e.g.*, *United States v. Jenkins*,

21

DKC-12-0043, 2021 WL 5140198, at *4-5 (D. Md. Nov. 4, 2021) (granting compassionate release to a defendant based on his obesity and chronic kidney disease, in spite of the fact that he was fully vaccinated against COVID-19); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances); *United States v. Hussain*, PWG-13-661, 2021 WL 3367822, at *4 (D. Md. Aug. 3, 2021) (explaining that a fully vaccinated defendant with a history of smoking as well as a number of underlying conditions, including moderate asthma and hypertension, presented an extraordinary and compelling reason for his release).

In sum, I am persuaded that McCullough's combined health conditions qualify him for compassionate release.

## B.

The determination of an extraordinary and compelling ground for compassionate release does not end the analysis, however. The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).

Even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy

statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

McCullough does not offer the Court any argument as to why a balancing of the sentencing factors weighs in favor of his release. Rather, the Motion mentions only that McCullough plans to live with his girlfriend upon his release from prison, and that he will have the support of his grandmother upon his release. *See* ECF 914-2 at 3; ECF 914-3 at 5.

In my view, these assertions are insufficient to justify McCullough's release. Notably, defendant is currently serving an 84-month sentence for serious drug offenses. ECF 760 at 1. Additionally, defendant has a long record of criminal activity, which spans decades and includes multiple drug offenses. *See* ECF 759, ¶¶ 28, 30, 31, 33. McCullough has been incarcerated since September 18, 2019, which equates to service of approximately 37% of the sentence that the Court imposed. ECF 760 at 2. And, the sentence was well below the range of 151 to 188 months contemplated by the Guidelines. *See* ECF 759, ¶ 79.

Furthermore, in *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court recognized that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'" (Quoting 18 U.S.C. § 3553(a)(1)). But, McCullough has not provided the Court with any information as to his post-sentencing conduct, so as to warrant a finding that, if released, he would not pose a danger to the community.

In light of the foregoing, I am persuaded that a balancing of the sentencing factors as set forth in 18 U.S.C. § 3553(a) weighs heavily against defendant's release at this juncture. Therefore, I shall deny the Motion, without prejudice.

## V.    Conclusion

Accordingly, I shall deny the Motion, without prejudice.  An Order follows, consistent with this Memorandum Opinion.


Date: April 6, 2022                                                    _____/s/_____

                                                                        Ellen L. Hollander
                                                                        United States District Judge